_____

NOE LEINHEISER,                     :
                                    :
            Plaintiff,              :          Civil No. 17-11642 (RBK) (AMD)
                                    :
      v.                            :
                                    :
T. HOEY, et al.,                    :          **OPINION**
                                    :
            Defendants.             :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.      INTRODUCTION

The Plaintiff, Noe Leinheiser, is a convicted federal prisoner incarcerated at the Federal Correctional Institution in Fort Dix, New Jersey. The plaintiff is proceeding *pro se* with a civil rights complaint filed pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff's application to proceed *in forma pauperis* was previously granted.

At this time, this Court must screen the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief can be granted, or because it seeks monetary relief from a defendant who is immune from suit. For the reasons set forth below, this Court concludes that the complaint will proceed in part.

## II.      FACTUAL BACKGROUND

The allegations of the complaint will be construed as true for purposes of this screening opinion. The complaint names ten defendants: (1) T. Hoey, NREMT-P; (2) D. Alatory, NREMT-P; (3) R. Newbury, RN; (4) Jose Ravago, MLP; (5) Ms. D, RN; (6) Grant (FNU), Correctional

Officer; (7) Dr. Ravi Sood, M.D.; (8) Dr. Ahmar Shakir (FNU); (9) Newland (FNU), RM/CD; and (10) Federal Bureau of Prisons, Fort Dix.

On October 20, 2014, while Plaintiff was incarcerated at the Federal Correctional Institution in Fort Dix, New Jersey ("FCI Fort Dix"), he received ACL reconstruction surgery on his left knee. The surgery was performed by Ahmar Shakir ("Defendant Shakir"), a doctor of orthopedics at St. Francis Hospital. At approximately 4:00 p.m. that same day, Plaintiff returned to FCI Fort Dix and was transported by T. Hoey ("Defendant Hoey"), an EMT, back to his housing unit. Defendant Hoey allegedly pulled up to Plaintiff's housing unit and released Plaintiff from the hospital transportation cart without assistance. (Dkt. No. 1-2, at pg. 1). Due to the anesthetic Plaintiff had been given for pain at the hospital, he was unable to feel his left leg. As Plaintiff walked into his room, his left knee collapsed causing him to fall.

The following day, on October 21, 2014 at approximately 4:00 a.m., Plaintiff went to use the restroom but was still unable to feel his leg. This lack of feeling caused Plaintiff to fall onto his left side, which opened a stitch in his left knee. However, Plaintiff did not notice this injury until later. At approximately 1:30 p.m. that day, Plaintiff walked unassisted to the medical unit, and requested a device that would aid him in walking. After "begging" for a cane, Plaintiff was provided with one. At that time, Plaintiff also informed Defendant Hoey that he was not currently in any pain because the anesthetic had not worn off. The pain and anti-inflammatory medications prescribed for Plaintiff, however, were still ordered.

Plaintiff subsequently stopped by the medical unit at various times to see if his prescriptions had been filled, but to no avail. According to Plaintiff, "[he] did not take the pain medication ordered for [him] because of the anesthetic that was injected into [his] left hip lasted

longer than the 7-8 hours that the hospital suggested. [He] was not able to fully feel [his] leg for four days and the pain medication ordered was for 5 days." (Dkt. No. 1-2, at pg. 2).

On October 22, 2014, Plaintiff went to the medical unit to have his leg dressing changed since his suture was partially torn and draining. One week later, on October 29, 2014 at 11:30 a.m., Plaintiff attempted to stand up and heard a soft "pop" in his left knee joint. Although his knee did not bother him at that time, approximately one hour later he felt his knee begin to tighten and swell. Plaintiff felt a burning sensation in his knee and when he attempted to stand, he discovered that he was unable to walk easily. Plaintiff then limped, with the assistance of his cane, to the medical unit to report this problem. Plaintiff was again seen by Defendant Hoey, who ordered that Plaintiff receive x-rays. Defendant Hoey informed Plaintiff that with exercise the problem should subside. Plaintiff sat in the medical waiting area from approximately 1:30 p.m. to 3:30 p.m. as the pain in his left knee became increasingly unbearable. Plaintiff stated in his Complaint that, through his pants, he was able to see his entire leg swelling. Plaintiff asked Defendant Hoey if he could see a doctor but Defendant Hoey denied Plaintiff's request. Plaintiff also asked D. Alatory ("Defendant Alatory"), another EMT in the medical unit at that time, if he could see a doctor because Plaintiff believed there was a problem with his leg. Defendant Alatory responded, "Nope, can't help you." (Dkt. No. 1-2, at pg. 2).

On October 30, 2014, Plaintiff's unit officer, Mr. Sarfo, came by Plaintiff's cell and inquired how Plaintiff felt. Plaintiff informed Mr. Sarfo that he was in pain and unable to move his left leg. Mr. Sarfo notified the medical unit and Defendant Hoey transported Plaintiff from his housing unit to the medical unit for observation. Defendant Hoey requested that Jose Ravago ("Defendant Ravago"), a physician's assistant in FCI Fort Dix's medical unit, examine Plaintiff and determine whether Plaintiff needed medical attention. Defendant Ravago allegedly advised

Plaintiff that he should, "walk like a 97 year old man and not like a 17 year old." (Dkt. No. 1-2, at pg. 3). Plaintiff asked Defendant Ravago about the large lump above Plaintiff's knee and the intense pain he felt in his leg. Defendant Ravago responded that the strongest pain reliever he could provide was Motrin and that he was very busy with other patients and unable to assist Plaintiff any further. Plaintiff then asked Defendant Hoey if, "that was it?" to which Defendant Hoey responded, "yes." Plaintiff did not receive the Motrin for his pain until November 3, 2014, despite the fact that the medication was ordered on October 20, 2014 and received by the "pill line" on October 31, 2014. Plaintiff states that, "for 14 days [he] went without proper medication after [his] surgery." (Dkt. No. 1-2, at pg. 3).

On the morning of November 6, 2014, Plaintiff went to "sick call" to again request treatment for his leg. Plaintiff was no longer able to walk, even with the assistance of a cane. In order to attend sick call in the medical unit, Plaintiff had to borrow a wheelchair from another inmate. At sick call, Plaintiff was seen by R. Newbury ("Defendant Newbury"), a nurse in the medical unit, who took Plaintiff's vitals and asked what issues Plaintiff was experiencing. Plaintiff provided Defendant Newbury with a brief medical history of his knee and requested to be "put on the call out" to see a doctor. Plaintiff also requested a wheelchair to be able to move around. Defendant Newbury informed Plaintiff that only a doctor could approve Plaintiff's request for a wheelchair, but that Defendant Newbury did not see a reason for Plaintiff to visit with a doctor at that time. Defendant Newbury advised Plaintiff that he should exercise his leg to reduce the swelling. Defendant Newbury stated that the exercise would, "hurt like hell," and suggested that Plaintiff find a "friend" to help bend his legs and assist him with movement.

Upon returning to his housing unit that day, Plaintiff decided to take a shower with the use of the wheelchair he had borrowed from another inmate. While seated on a bench inside the

shower, Plaintiff was overcome with dizziness and anxiety which caused him to fall off the bench. The fall injured Plaintiff's knee and caused him to lose consciousness. Another inmate, Curtis Motley, heard the fall and notified the unit officer. Mr. Motley proceeded to help Plaintiff back into the wheelchair and took Plaintiff to the medical unit. Plaintiff was not seen by a doctor, but rather by Defendant Newbury again. Defendant Newbury did not take Plaintiff's vitals, but he did inspect Plaintiff's leg. Defendant Newbury subsequently informed Plaintiff that he was fine and could go back to his housing unit.

On November 7, 2014, Plaintiff's leg began draining "orange-looking fluid" and he had to apply bandages for seven days. Plaintiff and his friends cleaned the wound themselves and used torn towels as makeshift bandages. Plaintiff stated that, "it got to the point where [he] was using whole t-shirts and towels to cover [his] leg because of the amount of fluid that was draining out." (Dkt. No. 1-2, at pg. 4).

On the morning of November 10, 2014, Unit Officer Robels informed Plaintiff that Plaintiff's boss from his job at UNICOR was calling to inquire whether he was ready to return to work. Plaintiff informed Officer Robels that he was still unable to walk and that his leg was leaking fluid. Officer Robels inspected Plaintiff's leg and advised him to go to the medical unit to have it treated. Officer Robels informed Plaintiff that, if left untreated, Plaintiff could lose his leg. Plaintiff explained to Officer Robels his attempts to receive treatment but stated that he had been denied each time. Officer Robels decided to notify the medical unit himself of Plaintiff's medical problem. Officer Robels apparently spoke with a nurse, Ms. D ("Defendant Ms. D") who informed Officer Robels that there was nothing more that could be done for Plaintiff's leg if Plaintiff refused to exercise it. Officer Robels relayed the conversation to Plaintiff and stated that he would notify

the Operations Lieutenant on duty who would, "force medical to see [Plaintiff]." (Dkt. No. 1-2, at pg. 4). No one came back to check on Plaintiff.

Plaintiff was bed ridden from October 29, 2014 through November 14, 2014. During that time, other inmates brought Plaintiff food and assisted him in changing and using the restroom. Plaintiff showered only three times during those two weeks because he was unable to stand or move his leg due to severe pain. Plaintiff stated in his Complaint that when he attempted to walk, he felt that he was going to pass out. Plaintiff later learned that this was due, in part, from having diabetes. Plaintiff had previously been unaware that he was afflicted with this disease. Between October 29, 2014 and November 14, 2014, Plaintiff attempted four times to see a doctor but was denied. Finally, on November 14, 2014, Plaintiff again went to the medical unit. When Defendant Newbury pulled the socks off of Plaintiff's feet, the left sock was soaked with fluid and blood. Defendant Newbury asked Plaintiff whether he wanted to keep the socks. When Plaintiff stated that he did not, Defendant Newbury threw the socks away, utilizing the regular trash bin rather than the infectious waste bin. Plaintiff was then seen by R. Newland ("Defendant Newland"), a doctor in the medical unit, who ordered that Plaintiff remain "in the institution" and be treated for fourteen days with Keflex. Plaintiff stated in his Complaint, "I believe that if that order was followed, I would not be alive to make these statements." (Dkt. No. 1-2, at pg. 5).

Plaintiff alleged that as of January 2, 2015, he had very limited use of his leg. He was unable to straighten his leg or bend it to a ninety-degree angle. Plaintiff was also unable to put weight on his leg or stand straight. Plaintiff could only lift his foot off the floor while in a seated position. Plaintiff was still in constant pain, his leg continued to worsen, and he was unable to move around without the use of crutches or a wheelchair.

On January 12, 2015, Plaintiff heard a rumor that UNICOR would be relocating all of its inmates into one housing unit, unit 5803. Since Plaintiff was unable to move and reliant on a wheelchair, he felt that he had no choice but to quit his job at UNICOR. When Plaintiff notified a Mr. Silver that he would be quitting, Mr. Silver responded, "I'm moving you anyway, you're not going to tell me where you're going to live." (Dkt. No. 1-2, at pg. 6). Three days later, on January 15, 2015, Plaintiff was forced to move without assistance into unit 5803. Plaintiff used his wheelchair to move his belongings. On January 22, 2015, all inmates that had quit UNICOR were permitted to move back into their previous housing unit. Plaintiff, however, was forced to remain in unit 5803. Plaintiff alleges that this was retaliation for quitting UNICOR and for the "write-ups" he was submitting about the FCI Fort Dix medical staff.

On February 10, 2015, Plaintiff went to the medical unit to be seen by the orthopedic surgeon, Defendant Shakir. Plaintiff informed Defendant Shakir that he still had limited use of his leg, and that "something from the inside of [his] leg was moving out underneath the skin" and becoming sensitive. (Dkt. No. 1-2, at pg. 7). Defendant Shakir expressed confusion as to why Plaintiff was still unable to walk and wondered why Plaintiff still needed the assistance of crutches. When Defendant Shakir examined Plaintiff's knee, he informed Plaintiff that what was moving underneath the skin was the screw that had been placed into Plaintiff's knee during his ACL reconstruction surgery. Defendant Shakir ordered an MRI for Plaintiff as soon as possible.

On February 25, 2015, Plaintiff was seen by Defendant Ravago who stated that, "[Plaintiff] was pretty much screwed." (Dkt. No. 1-2, at pg. 7). Defendant Ravago apparently could not believe the condition of Plaintiff's knee and stated that it was caused by the "incompetence of the medical staff at Ft. Dix." (Dkt. No. 1-2, at pg. 7). Defendant Ravago extended Plaintiff's

wheelchair and crutch privileges and told Plaintiff that he would recommend a total knee replacement.

On March 2, 2015, Plaintiff was seen by Ravi Sood ("Defendant Sood"), a doctor at FCI Fort Dix. Defendant Sood informed Plaintiff that his knee would not improve without surgery. Defendant Sood stated that, "he would be meeting with the medical community on Wednesday and he would push for [Plaintiff]." (Dkt. No. 1-2, at pg. 7).

On March 26, 2015, Plaintiff was transported to RWJ Hamilton Hospital for an MRI. (Dkt. No. 1-2, at pg. 7). On April 6, 2015, Plaintiff again saw Defendant Shakir who informed Plaintiff that he would indeed need a total knee replacement because there was too much damage that had been caused by the infection in Plaintiff's knee. Defendant Shakir recommended that Plaintiff begin using a knee brace. Defendant Shakir also stated that in six months, Plaintiff would be able to receive a cortisone shot for his knee, and in one to two years, Plaintiff would need to have a bone analysis taken to ensure that there was no longer an infection in the bone. Only after that time would Defendant Shakir recommend Plaintiff receive a total knee replacement.

On June 2, 2015, Plaintiff saw Defendant Sood to go over his MRI results. Defendant Sood issued Plaintiff a four-wheel walker and a knee brace, but told Plaintiff to visit a Mr. Lebron to receive this equipment. Upon speaking with Mr. Lebron, Plaintiff was told that he would have to buy his own knee brace at the commissary, even though the commissary did not have the type of knee brace that had been issued by Defendant Sood.

Several months later, on December 29, 2015, Plaintiff was seen by Defendant Ravago. Plaintiff informed Defendant Ravago that Plaintiff's knee was buckling from time to time, and that he was having constant pain in his knee because it would "pop" when he walked. Defendant

Ravago told Plaintiff that he would "make some calls" for Plaintiff to get the knee brace that had been recommended by Defendant Sood. (Dkt. No. 1-2, at pg. 9).

On January 21, 2016, Plaintiff had an appointment at the medical unit with Physician's Assistant, Ms. Mello. At this appointment, Ms. Mello refused to listen to issues afflicting Plaintiff's knee, and "all she wanted to hear was that [Plaintiff] needed a knee brace." (Dkt. No. 1-2, at pg. 9). Ms. Mello told Plaintiff to return the following day to receive a brace. Plaintiff attempted to explain to Ms. Mello that the medical unit did not have the type of knee brace Defendant Sood had issued, but Ms. Mello replied, "that is all [Plaintiff was] getting." (Dkt. No. 1-2, at pg. 9). Plaintiff then requested to see Defendant Sood, but Ms. Mello stated that Plaintiff would have to wait until his next chronic care visit. When Plaintiff asked when that was, Ms. Mello responded, "goodbye, you're done." (Dkt. No. 1-2, at pg. 9).

The following day, January 22, 2016, Plaintiff returned to the medical care unit to receive a knee brace, as instructed by Ms. Mello. Defendant Newbury and Mr. Lebron were both present and issuing supplies to the prisoners when Plaintiff arrived. When Plaintiff requested a knee brace, Defendant Newbury exchanged looks with Mr. Lebron and subsequently informed Plaintiff that the knee braces were out of stock. Defendant Newbury advised Plaintiff that the knee braces had been out of stock for three weeks, and that Defendant Newbury "was not going to bother looking" for one. (Dkt. No. 1-2, at pg. 9). When Plaintiff inquired when the next shipment would arrive, Defendant Newbury stated "not for a long time." (Dkt. No. 1-2, at pg. 9).

On June 28, 2016, Plaintiff was again seen by Defendant Sood. Defendant Sood prescribed two medications, one for a Vitamin D deficiency and one for pain management. When Plaintiff received the medications on July 1, 2016, and began taking them, he experienced side effects that

made him feel ill.  The side effects continued until Plaintiff stopped taking the medications on July 4, 2016.

On July 5, 2016, Plaintiff went to the medical unit to report the side effects he was experiencing.  Plaintiff saw Defendant Sood and informed him of the adverse reaction.  Defendant Sood simply told Plaintiff to stop taking the medications, then turned and walked away.  Defendant Sood did not ask Plaintiff what side effects he was experiencing, nor did he "ask any medical questions that a doctor would or should be normally asking."  (Dkt. No. 1-2, at pg. 10).  After seeing Defendant Sood, Plaintiff saw the Health Administrator and complained about the fact that he had never received the knee brace issued by Defendant Sood and that he had never received a "bone scan." (Dkt. No. 1-2, at pg. 10).  The Health Administrator immediately scheduled the bone scan and informed Plaintiff that the reason he had not received a knee brace is because Defendant Sood never specified the type of knee brace Plaintiff needed.

One week later, Plaintiff saw Defendant Sood again.  During this visit, Plaintiff relayed his conversation with the Health Administrator to Defendant Sood.  Defendant Sood "rolled his eyes and muttered the word 'idiots'", and proceeded to write down that Plaintiff should receive a hinged knee brace.  (Dkt. No. 1-2, at pg. 10).  Two weeks later, Plaintiff saw Assistant Health Administrator, Mr. Wilks, and was given a hinged knee brace.  However, when Plaintiff tried it on, the brace was too tight.  Mr. Wilks explained that Plaintiff should be given a "ready" knee brace, but the prison did not have one.  Mr. Wilks told Plaintiff that the hinged knee brace "should be ok." (Dkt. No. 1-2, at pg. 10).  After receiving the brace, Plaintiff complained twice to Mr. Wilks about it being too tight, but to no avail.  Plaintiff subsequently stopped wearing the brace because he felt it was cutting off the circulation in his leg and causing swelling.  (Dkt. No. 1-2, at pg. 10).

On September 2, 2016, Plaintiff was taken to Robert Woods Hospital for a "bone scan" of his left leg.

On September 30, 2016, Plaintiff again saw the Health Administrator and explained that his knee brace was too tight. The Health Administrator ordered Plaintiff a new properly fitted knee brace.

On December 26, 2016, Plaintiff was informed by a staff member that his knee replacement surgery "failed" because Defendant Sood did not request the proper "770" for transfer to a medical facility. (Dkt. No. 1-2, at pg. 11).

Almost nine months later, in August of 2017, Plaintiff was "out for an eye-screening" when he happened to walk by Defendant Sood's office and notice that the door was open. Plaintiff went inside and asked Defendant Sood when he would be scheduled for his knee replacement. Unaware of what Plaintiff was referring to, Defendant Sood checked his computer and informed Plaintiff that the surgery had been "disapproved." (Dkt. No. 1-2, at pg. 11). Plaintiff responded that the surgery *had* been approved, but that Plaintiff was just waiting for Defendant Sood to send the proper transfer request. Defendant Sood then informed Plaintiff that the procedure had been cancelled because Plaintiff had not lost any weight.

On September 20, 2017, Plaintiff spoke with Mr. Wilks and informed him of his conversation with Defendant Sood. Mr. Wilks stated that the knee replacement surgery had been approved by the Regional Office and that there had not been any cancellations. Mr. Wilks also stated that while there was an issue with Plaintiff's weight, it "wasn't too bad." (Dkt. No. 1-2, at pg. 11). Mr. Wilks advised Plaintiff to lose four to six pounds.

Two days later, on September 22, 2017, Plaintiff again saw Defendant Sood. who told Plaintiff that his knee replacement surgery was cancelled until Plaintiff lost fifteen to twenty

pounds.  Defendant Sood informed Plaintiff that he would not permit anyone else to manage Plaintiff's weight and that Defendant Sood would take care of it.

Plaintiff subsequently filed the instant Complaint in November 2017 and raised denial of medical care claims against each of the named defendants.

### III.    LEGAL STANDARDS

**A.  Standard for *Sua Sponte* Dismissal**

Under the Prisoner Litigation Reform Act, Pub.L. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (Apr. 26, 1996) ("PLRA"), district courts must review complaints in those civil actions in which a person proceeds *in forma pauperis*.  *See* 28 U.S.C. § 1915(e)(2)(B).  District courts may *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  *See id.*  According to the Supreme Court's decision in *Ashcroft v. Iqbal*, "a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ).

"The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Schreane v. Seana*, 506 F. App'x 120, 122 (3d Cir. 2012) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)); *Mitchell v. Beard*, 492 F. App'x 230, 232 (3d Cir. 2012) (discussing 28 U.S.C. § 1997e(c)(1)); *Courteau v. United States*, 287 F. App'x 159, 162 (3d Cir. 2008) (discussing 28 U.S.C. § 1915A(b)).  That standard is set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as explicated by the United States Court of Appeals for the Third Circuit.  To survive the court's screening for

failure to state a claim, the complaint must allege 'sufficient factual matter' to show that the claim is facially plausible. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). "[A] pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

*Pro se* pleadings, as always, will be liberally construed. *See Haines v. Kerner*, 404 U.S. 519 (1972). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

**B. Bivens Actions**

In 1871, Congress enacted 42 U.S.C. § 1983 which provides money damages for individuals whose constitutional rights were violated by a state official. No analogous statute was created for individuals whose constitutional rights were violated by federal officials. However, 100 years later in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that, "even absent statutory authorization, [the courts] could enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizure." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1854 (2017). Since *Bivens* was decided, the court has only recognized two other implied causes of action: Fifth Amendment gender discrimination, *Davis v. Passman*, 442 U.S. 228 (1979), and Eighth Amendment inadequate medical care, *Carlson v. Green*, 446 U.S. 14 (1980). "These three cases—*Bivens, Davis*, and *Carlson*—represent the only instances in which the Court has approved

of an implied damages remedy under the Constitution itself." *Ziglar*, 137 S. Ct. at 1855. As is relevant in the present case, the Supreme Court has recognized an implied cause of action for Eighth Amendment inadequate medical care claims against a federal actor who is personally involved in the deprivation. *Carlson*, 446 U.S. at 19.

In order to state a claim under *Bivens*, a plaintiff must allege: (1) a deprivation of a right secured by the Constitution or laws of the United States; and (2) that the deprivation of the right was caused by a person acting under color of federal law. *See Couden v. Duffy*, 446 F.3d 483, 491 (3d Cir. 2006).

## IV.    DISCUSSION

Plaintiff brings individual capacity *Bivens* claims against various officers at FCI Fort Dix for inadequate medical care in violation of the Eighth Amendment. To state an inadequate medical care claim, a plaintiff must allege: (1) a serious medical need; and (2) "acts or omissions" by prison officials demonstrating that they had a "deliberate indifference" to that need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

A medical need is deemed "serious," if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)). A medical need is also deemed "serious," if "unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care." *Id.* at 347 (citing *Estelle*, 429 U.S. at 105).

The second element of an inadequate medical care claim requires an inmate to demonstrate that prison officials acted with deliberate indifference to his serious medical need. *See Natale*, 318 F.3d at 582. Deliberate indifference is more than mere medical malpractice or negligence. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Rather, deliberate indifference has been likened to conduct that includes "recklessness or a conscious disregard of a serious risk." *Id.*; *see also Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017). More specifically, the Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citing *Durmer v. O'Carroll,* 991 F.2d 64, 88 (3d Cir. 1993)); *see also Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

Additionally, a plaintiff must assert that each defendant had personal involvement in the alleged wrongs, and a defendant's liability may not be predicated solely on the operation of *respondeat superior. Rizzo v. Goode*, 423 U.S. 362 (1976); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The requisite personal involvement may be demonstrated through allegations of personal direction or of actual knowledge and acquiescence. *See Rode*, 845 F.2d at 1207; *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995); *Jackson v. Camden Cty. Corr. Facility*, No. 12–7538, 2013 WL 1844636, at *3 n. 1 (D.N.J. Apr.29, 2013).

A. <u>Defendant Hoey</u>

Plaintiff first alleges that Defendant Hoey, an EMT in the medical unit, denied him medical care by refusing to allow Plaintiff to see a doctor, and by denying Plaintiff access to a wheelchair. In Plaintiff's Complaint, he states that on October 29, 2014, he felt a "pop" in his left knee joint and subsequently began experiencing pain and swelling in his leg. When Plaintiff went to the

medical unit and saw Defendant Hoey, Defendant Hoey ordered X-rays and told Plaintiff that the condition would resolve if Plaintiff exercised his left leg. Plaintiff stated in his Complaint that the swelling in his leg was noticeable through his pants but when he asked Defendant Hoey whether he could see a doctor because "something was wrong," Defendant Hoey responded, "No." (Dkt. No. 1-2, at pg. 2).

As discussed above, a medical need is "serious" if it is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth Cty Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Here, the swelling in Plaintiff's leg was apparently so obvious that it was visible through Plaintiff's pants. When Defendant Hoey examined Plaintiff in the medical unit, he would have seen the swelling. Moreover, Defendant Hoey had previously transported Plaintiff after his knee surgery back to Plaintiff's housing unit, and Defendant Hoey had seen Plaintiff the day after his surgery when Plaintiff came to the medical unit to request a device to assist him in walking. Defendant Hoey was therefore aware of the fact that Plaintiff had recently undergone surgery on his left knee. When Plaintiff came into the medical unit seeking help for swelling and unbearable pain in his leg, Defendant Hoey was aware or should have been aware that Plaintiff had a serious medical need. Defendant Hoey demonstrated deliberate indifference to that need when he prevented Plaintiff from receiving needed medical treatment in the face of Plaintiff's complaints of extreme pain and swelling. Accordingly, the claim against Defendant Hoey for denial of medical care will be permitted to proceed.[1]

---

[1] This Court is aware that there may be a statute of limitations issue regarding this claim and other claims raised against various defendants. However, in light of the early stage of the proceedings and the possibility of a continuing violation of care, this Court will permit the claims with merit to proceed at this preliminary stage.

Regarding Plaintiff's claim that Defendant Hoey denied Plaintiff medical care when he denied Plaintiff's request for a wheelchair, Plaintiff has failed to provide sufficient facts to state a claim. Federal Rule of Civil Procedure 8(a)(2) requires that plaintiffs set forth "a short and plain statement of the claim showing that a pleader is entitled to relief." While this standard does not require detailed factual allegations, it does require more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the very least, the complaint must "give the defendants fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal citation omitted). Although courts are required to liberally construe pleadings drafted by *pro se* parties, pro se litigants must still allege facts, which if taken as true, will suggest the required elements of any claim that is asserted. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

Here, the Complaint details almost four years of Plaintiff's difficulties with his knee, but nowhere in the Complaint does it state when Plaintiff requested a wheelchair from Defendant Hoey. Without additional facts beyond, "[Defendant Hoey] refused and denied wheelchair," this Court is unable to determine whether Defendant Hoey knew of Plaintiff's serious medical need when Plaintiff requested the wheelchair, and whether Defendant Hoey was deliberately indifferent towards that need. Even construing Plaintiff's Complaint liberally, Plaintiff has still failed to provide more than an unadorned, the-defendant-unlawfully-harmed-me accusation, and he has failed to provide the grounds upon which his claim rests. Thus, Plaintiff's claim against Defendant Hoey for denial of access to a wheelchair will be dismissed without prejudice.

B.  Defendant Alatory

Plaintiff alleges that on October 29, 2014, the same day the Defendant Hoey denied him medical care, that Defendant Alatory also denied Plaintiff access to medical care.  Plaintiff's sole statement regarding the actions of Defendant Alatory is as follows: "I later asked EMT Alatory if I could see a doctor because there was something wrong with my leg and that I needed medical attention, and his reply was 'Nope, can't help you.'"  (Dkt. No. 1-2, at pg. 2).

Unlike Plaintiff's allegation against Defendant Hoey, it is unclear from the face of the Complaint whether Defendant Alatory knew that Plaintiff had a serious medical need.  Plaintiff alleges, without more, to have informed Defendant Alatory only that there was something "wrong" with his leg.  Plaintiff does not allege that he provided Defendant Alatory with a medical history of his knee, or that Defendant Alatory examined Plaintiff and should have been able to see the swelling of Plaintiff's leg.  Without additional information, it cannot be said that Defendant Alatory was aware that Plaintiff had a serious medical need.  Thus, Plaintiff has failed to demonstrate that Defendant Alatory was deliberately indifferent to Plaintiff's serious medical need.  Accordingly, Plaintiff's claim against Defendant Alatory for denial of medical care will be dismissed without prejudice.

C.  Defendant Newbury

In his Complaint, Plaintiff alleges that Defendant Newbury denied Plaintiff's requests to see a medical doctor, denied him access to a wheelchair, recommended Plaintiff solicit an inmate to provide physical therapy, and accused Plaintiff of faking his pain.  On November 6, 2014, Plaintiff went to the medical unit in an attempt to receive medical attention for the pain in his leg.  Plaintiff was seen by Defendant Newbury, whom he provided with a history of the recurring problems with his knee.  Plaintiff also informed Defendant Newbury that he was in pain, that he

needed a wheelchair in order to move around, and that he wanted to see a doctor. Defendant Newbury informed Plaintiff that a wheelchair would be a "bad idea," and that while Plaintiff would need a doctor's approval to receive a wheelchair, Defendant Newbury did not believe that Plaintiff's condition warranted a doctor visit. Defendant Newbury instead recommended that Plaintiff exercise his leg and stated that movement should alleviate the swelling.

Here, there are sufficient facts to suggest that Defendant Newbury was aware of Plaintiff's serious medical need and was deliberately indifferent to that need. Plaintiff provided Defendant Newbury with the medical history of his knee problems and informed Defendant Newbury that he was in such pain that he needed the assistance of a wheelchair. Defendant Newbury ignored Plaintiff's complaints and outright refused to provide Plaintiff with access to a doctor who could help with the pain or issue a wheelchair for Plaintiff to utilize. Plaintiff was not provided with any treatment for the pain in his knee. Therefore, Plaintiff has sufficiently alleged that Defendant Newbury refused Plaintiff necessary medical treatment and/or prevented Plaintiff from receiving medical treatment and Plaintiff's claims against Defendant Newbury will be permitted to proceed.

D. Defendant Ravago

Plaintiff alleges that Defendant Ravago refused him medical care and failed to provide Plaintiff with follow-up care after his knee surgery. According to Plaintiff, less than a month after his knee surgery on October 30, 2014, he was transported to the medical unit after informing his unit officer that he was experiencing pain in his left leg and that he was unable to move. In the medical care unit, Plaintiff was seen by Defendant Ravago, a physician's assistant. Plaintiff told Defendant Ravago that he felt a huge, burning lump above his knee and that he was experiencing intense pain. Defendant Ravago allegedly responded that he could provide Plaintiff with Motrin, and that Plaintiff should, "walk like a 97 year old man and not like a 17 year old." (Dkt. No. 1-2,

at pg. 3). Defendant Ravago then informed Plaintiff that he was busy with other patients, and that he could not assist Plaintiff any further.

Although Plaintiff alleges that Defendant Ravago denied him medical care, Plaintiff's factual recitation demonstrates that Defendant Ravago *did* provide Plaintiff with medical care. Plaintiff has not established anything other than a disagreement over the type of treatment rendered. "[A] prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference." *Andrews v. Camden County,* 95 F.Supp.2d 217, 228 (D.N.J. 2000). "[M]ere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990). Here, Plaintiff cannot demonstrate that Defendant Ravago was deliberately indifferent to his serious medical need because Defendant Ravago treated Plaintiff by proscribing him Motrin for his pain. Defendant Ravago did not, as Plaintiff alleges, refuse to treat Plaintiff. Therefore, the denial of medical care claim against Defendant Ravago will be dismissed without prejudice.

Regarding Defendant Ravago's lack of follow-up care after Plaintiff's surgery, Plaintiff has failed to sufficiently state a claim for a denial of medical care. Plaintiff's surgery was conducted by the orthopedic surgeon, Defendant Shakir. Nowhere in Plaintiff's Complaint does he allege that Defendant Ravago was aware of Plaintiff's surgery until almost a month later when he saw Defendant Ravago in the medical unit. Plaintiff also fails to allege that Defendant Ravago knew that Plaintiff was in need of follow-up care, or that Defendant Ravago knew Plaintiff needed follow-up care but that Plaintiff was not receiving it from another provider. Significantly, Plaintiff does not allege that Defendant Shakir even ordered follow-up care. Accordingly, Plaintiff cannot demonstrate that he had a serious medical need that Defendant Ravago knew about and was

deliberately indifferent towards. Plaintiff's claim against Defendant Ravago for failure to provide follow-up care is therefore dismissed without prejudice.

E. Defendant Ms. D

Plaintiff states that Defendant Ms. D also refused to provide him with medical care. According to Plaintiff's Complaint, approximately one month after his knee surgery, Plaintiff informed his unit officer that he was unable to return to his former job because his leg was leaking fluid and he was unable to walk. The unit officer immediately contacted a nurse, Defendant Ms. D, to inform her about Plaintiff's condition and the "infectious liquid" leaking from Plaintiff's knee. Defendant Ms. D allegedly told the unit officer that Plaintiff had been advised to exercise his leg, and that there was nothing further that could be done if Plaintiff refused to follow those instructions.

Although Plaintiff's allegations are sparse, Plaintiff has sufficiently stated a claim against Defendant Ms. D for a denial of medical care. Defendant Ms. D was aware that Plaintiff had a serious medical need when the unit officer informed her that Plaintiff had "infectious liquid" leaking from his knee, and Defendant Ms. D demonstrated a deliberate indifference when she intentionally refused to provide Plaintiff with any treatment. Accordingly, Plaintiff's claim will be permitted to proceed against Defendant Ms. D. Plaintiff can amend his Complaint when he finds out the name of Ms. D, so that she may be properly served.

F. Defendant Grant

Similar to the allegations against Defendant Ms. D, Plaintiff states that Defendant Grant, a correctional officer at FCI Fort Dix, observed Plaintiff's infected and leaking knee, but refused to refer Plaintiff for medical treatment. Defendant Grant was aware of Plaintiff's serious medical need when he observed Plaintiff's leaking knee, and Defendant Grant was deliberately indifferent

to that need when he intentionally refused to provide Plaintiff with access to medical treatment in the face of Plaintiff's obvious medical need. Therefore, Plaintiff's denial of medical care claim against Defendant Grant will proceed past screening.

G. Defendant Sood

Plaintiff next alleges that Defendant Sood refused to provide him with medical care after Plaintiff complained of severe pain in his left leg, and that Defendant Sood failed to provide follow-up treatment after Plaintiff's ACL surgery. It is unclear to this Court when Plaintiff complained of severe pain in his leg to Defendant Sood and was denied treatment. From the facts provided by Plaintiff, there was never an occasion where Defendant Sood refused Plaintiff medical care. Based upon the information provided, the first time Plaintiff saw Defendant Sood was on March 2, 2015, when Defendant Sood informed Plaintiff that he required knee surgery. Plaintiff next saw Defendant Sood on June 2, 2015, when Defendant Sood issued Plaintiff a walker and knee brace. Plaintiff again saw Defendant Sood almost a year later on June 28, 2016, when Defendant Sood issued Plaintiff a prescription for a Vitamin D deficiency and a prescription for pain management. On July 5, 2016, Plaintiff saw Defendant Sood and informed him that he was having an adverse reaction to the medications. Defendant Sood advised Plaintiff to cease taking the medications. One week later, Plaintiff saw Defendant Sood again, and Defendant Sood issued him another knee brace. Plaintiff's subsequent interactions with Defendant Sood were to discuss scheduling of Plaintiff's knee surgery.

In none of these interactions that Plaintiff thoroughly detailed in his Complaint, did he allege that he ever complained to Defendant Sood of severe pain in his leg and that Defendant Sood refused him medical treatment. As discussed previously, according to Federal Rule of Civil Procedure 8(a)(2), a plaintiff must set forth "a short and plain statement of the claim showing that

a pleader is entitled to relief." A standard which requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Although courts are required to liberally construe pleadings drafted by *pro se* parties, pro se litigants must still allege facts, which if taken as true, will suggest the required elements of any claim that is asserted. *Mala*, 704 F.3d at 245 (citation omitted). Here, Plaintiff has failed to allege facts, which, taken as true, suggest the required elements of an inadequate medical care claim under the Eighth Amendment. Accordingly, Plaintiff's claim against Defendant Sood for denial of medical care after Plaintiff complained of severe pain will be dismissed without prejudice.

Regarding Plaintiff's allegation that Defendant Sood failed to provide follow-up care after Plaintiff's knee surgery, Plaintiff has failed to sufficiently state a claim for a denial of medical care. As discussed above, Plaintiff's surgery was conducted by orthopedic surgeon, Defendant Shakir. Plaintiff does not allege that Defendant Shakir ever ordered that Plaintiff receive follow-up care, nor that it would have been Defendant Sood's responsibility to provide that care, if any was required. Additionally, Plaintiff's fails to allege that Defendant Sood even knew about Plaintiff's ACL surgery prior to first seeing him on October 30, 2014, or that once Defendant Sood knew about the surgery that Defendant Sood was aware that Plaintiff was not receiving follow-up care from Defendant Shakir or another provider. Accordingly, Plaintiff cannot demonstrate that he had a serious medical need that Defendant Sood knew about and was deliberately indifferent towards. Plaintiff's claim against Defendant Sood for failure to provide follow-up care is therefore dismissed without prejudice.

H. Defendant Shakir

Plaintiff brings a denial of medical care claim against Defendant Shakir, the orthopedic surgeon who performed Plaintiff's knee surgery, for failing to provide follow-up treatment after

Plaintiff's ACL surgery. Plaintiff states simply that, Defendant Shakir never conducted a follow-up visit "per recommendation." (Dkt. No. 1-2, at pg. 6).

Giving all inferences to Plaintiff, Plaintiff has sufficiently alleged a denial of medical care claim against Defendant Shakir. Defendant Shakir was the surgeon who performed Plaintiff's knee surgery, and who allegedly recommended Plaintiff be seen for a follow-up visit. Defendant Shakir, therefore, knew of Plaintiff's serious medical need, one that had been diagnosed by a physician as requiring treatment, and was deliberately indifferent to Plaintiff's medical need when he failed to provide a follow-up visit with Plaintiff. Accordingly, Plaintiff's claim against Defendant Shakir will be permitted to proceed.

I.   Defendant Newland

Plaintiff states that Defendant Newland, a doctor at FCI Fort Dix, denied him medical care when Defendant Newland refused to send Plaintiff to the hospital after being informed that Plaintiff's knee was infected and leaking, and after prison staff recommended that Plaintiff receive emergency services. While Plaintiff sufficiently alleges that Defendant Newland was aware of Plaintiff's serious medical need, his infected and leaking knee, Plaintiff has not sufficiently alleged that Defendant Newland was deliberately indifferent to that need by refusing to send Plaintiff to the hospital.

"[M]ere disagreements over medical judgment do not state Eighth Amendment claims" because there may be "several acceptable ways to treat an illness." *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990) (alteration in original). "[A] prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference." *Andrews v. Camden Cty.,* 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Even one doctor's disagreement with another doctor's professional judgment does not state a violation of the Eighth Amendment. *See White*, 897 F.2d

at 110. Rather, deliberate indifference requires that a defendant, aware of a plaintiff's serious medical need, fails to *reasonably respond* to that need. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Here, Defendant Newland did not unreasonably respond to Plaintiff's medical need. On November 14, 2014, Plaintiff went to the medical unit and was seen by Defendant Newland. At that time, Defendant Newland did not order for Plaintiff to be sent to the hospital, but rather ordered that Plaintiff be treated for fourteen days with Keflex. Although Plaintiff may disagree with that course of treatment, Defendant Newland did not demonstrate deliberate indifference to Plaintiff's medical need. Defendant Newland treated Plaintiff at the time he came into the medical unit. Thus, Defendant Newland did not demonstrate deliberate indifference to Plaintiff's medical need, and the denial of care claim against Defendant Newland will be dismissed without prejudice.

J. Defendant FCI Fort Dix

Finally, Plaintiff raises a denial of medical care claim against Defendant FCI Fort Dix. However, sovereign immunity bars lawsuits against the United States and its agencies, unless Congress has specifically waived that immunity. *See United States v. Mitchell,* 445 U.S. 535, 538 (1980); *United States v. Testan,* 424 U.S. 392, 399 (1976). The United States has not waived its sovereign immunity for suits alleging constitutional torts. *See Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 477–78 (1994). Therefore, a *Bivens* action for civil damages cannot be brought against the United States or its agencies or instrumentalities. *See id.* at 485–86; *Johnstone v. United States,* 980 F.Supp. 148, 151 (E.D.Pa.1997) (finding that sovereign immunity precludes a *Bivens* action for damages against the Bureau of Prisons); *Martinez v. Williams,* No. 89–5641, 1989 WL 129849, at *1 (E.D.Pa. Oct. 23, 1989) (finding that sovereign immunity precludes a

*Bivens* action for damages against a Federal Correctional Institution).  As a result, Plaintiff's *Bivens* claim against the FCI Fort Dix is improper and must be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's Complaint will be permitted to proceed in part and will be dismissed without prejudice in part.  As to Defendant Hoey, Plaintiff's claim that Defendant Hoey refused to provide Plaintiff with doctor care will be permitted to proceed.  Plaintiff's claim that Defendant Hoey denied him access to a wheelchair will be dismissed without prejudice.

As to Defendant Alatory, Plaintiff's claim that Defendant Alatory refused to provide him with doctor care will be dismissed without prejudice.

As to Defendant Ravago, Plaintiff's claim that Defendant Ravago refused Plaintiff medical care after Plaintiff complained of a large burning lump and pain in his leg, and Plaintiff's claim that Defendant Ravago failed to provide him with follow-up care after his ACL surgery will both be dismissed without prejudice.

As to Defendant Sood, Plaintiff's claim that Defendant Sood refused to provide Plaintiff with medical treatment after Plaintiff complained of severe pain, and Plaintiff's claim that Defendant Sood failed to provide Plaintiff with follow-up care after Plaintiff's ACL surgery will both be dismissed without prejudice.

As to Defendant Newland, Plaintiff's claim that Defendant Newland refused to send Plaintiff to the hospital for his knee will be dismissed without prejudice.

As to Defendant FCI Fort Dix, Plaintiff's claim that Defendant FCI Fort Dix denied him medical care will be dismissed with prejudice.

As to Defendant Newbury, Plaintiff's claims against Defendant Newbury for denial of medical care will be permitted to proceed.

As to Defendant Ms. D, Plaintiff's claim that Defendant Ms. D refused to provide Plaintiff treatment will be permitted to proceed.

As to Defendant Grant, Plaintiff's claim that Defendant Grant refused to provide him with medical treatment will be permitted to proceed.

Finally, as to Defendant Shakir, Plaintiff's claim that Defendant Shakir failed to provide Plaintiff with follow-up care after Plaintiff's ACL surgery will be permitted to proceed.


DATED: December  5th,  2018                          s/Robert B. Kugler
                                                     ROBERT B. KUGLER
                                                     United States District Judge