UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOE LEINHEISER, | Civil Action |
| Plaintiff, | No. 17-11642 (CPO) (AMD) |
| v. | |
| LISA DIMATTEO, et al., | OPINION |
| Defendants. | |

**O'HEARN, District Judge.**

Before the Court is Defendant DiMatteo and Defendant Grant's (collectively "Federal Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure Rule 56. (ECF No. 114.) For the following reasons, the Court will grant the Federal Defendants' motion.

## I. BACKGROUND

As the parties are intimately familiar with the facts of this case, and because the Court has already set forth the background of this matter in earlier Opinions, (ECF Nos. 3, 53), the Court will only set forth the background necessary for the instant motion. The remaining Defendants are: (1) Lisa DiMatteo, a former nurse at Federal Correctional Institution Fort Dix, (2) Clinton Grant, a former corrections officer at Fort Dix, and (3) Dr. Ahmar Shakir, a doctor previously employed as an orthopedic surgeon at St. Francis Hospital. (ECF No. 106.) Only Defendants DiMatteo and Grant have moved for summary judgment. (ECF No. 114.)

Judge Kugler previously set forth the relevant background as follows:

> On October 20, 2014, while Plaintiff was incarcerated at the Federal Correctional Institution in Fort Dix, New Jersey ("FCI Fort Dix"), he received ACL [anterior cruciate ligament] reconstruction surgery on his left knee. The surgery was performed by Ahmar Shakir ("Defendant Shakir"), a doctor of orthopedics at St. Francis Hospital . . . . Due to the anesthetic Plaintiff had been given for pain at the

hospital, he was unable to feel his left leg. As Plaintiff walked into his room, his left knee collapsed causing him to fall.

The following day, on October 21, 2014 at approximately 4:00 a.m., Plaintiff went to use the restroom but was still unable to feel his leg. This lack of feeling caused Plaintiff to fall onto his left side, which opened a stitch in his left knee.

. . . .

On October 22, 2014, Plaintiff went to the medical unit to have his leg dressing changed since his suture was partially torn and draining. One week later, on October 29, 2014 at 11:30 a.m., Plaintiff attempted to stand up and heard a soft "pop" in his left knee joint. Although his knee did not bother him at that time, approximately one hour later he felt his knee begin to tighten and swell. Plaintiff felt a burning sensation in his knee and when he attempted to stand, he discovered that he was unable to walk easily. . . .

On October 30, 2014, Plaintiff's unit officer, Mr. Sarfo, came by Plaintiff's cell and inquired how Plaintiff felt. Plaintiff informed Mr. Sarfo that he was in pain and unable to move his left leg. . . .

On the morning of November 6, 2014, Plaintiff went to "sick call" to again request treatment for his leg. Plaintiff was no longer able to walk, even with the assistance of a cane. In order to attend sick call in the medical unit, Plaintiff had to borrow a wheelchair from another inmate. At sick call, Plaintiff was seen by R. Newbury . . . a nurse in the medical unit, who took Plaintiff's vitals and asked what issues Plaintiff was experiencing. Plaintiff provided Defendant Newbury with a brief medical history of his knee and requested to be "put on the call out" to see a doctor. Plaintiff also requested a wheelchair to be able to move around. Defendant Newbury informed Plaintiff that only a doctor could approve Plaintiff's request for a wheelchair, but that Defendant Newbury did not see a reason for Plaintiff to visit with a doctor at that time . . . .

Upon returning to his housing unit that day, Plaintiff decided to take a shower with the use of the wheelchair he had borrowed from another inmate. While seated on a bench inside the shower, Plaintiff was overcome with dizziness and anxiety which caused him to fall off the bench. The fall injured Plaintiff's knee and caused him to lose consciousness. Another inmate, Curtis Motley, heard the fall and notified the unit officer. Mr. Motley proceeded to help Plaintiff back into the wheelchair and took Plaintiff to the medical unit . . . .

> On November 7, 2014, Plaintiff's leg began draining "orange-looking fluid" and he had to apply bandages for seven days. Plaintiff and his friends cleaned the wound themselves and used torn towels as makeshift bandages. Plaintiff stated that, "it got to the point where [he] was using whole t-shirts and towels to cover [his] leg because of the amount of fluid that was draining out."

(ECF No. 3, at 2–5 (citations omitted).)

In his Amended Complaint, as to Defendant Grant, Plaintiff clarified that on October 29, 2014, while Plaintiff was on his way to the medical unit, Defendant Grant was standing outside and threatened to "give [Plaintiff] a shot" if he walked towards the medical unit. (ECF No. 106, ¶¶ 24–27.) On November 6, 2014, while Plaintiff was waiting outside of the medical unit for wheelchair assistance, Defendant Grant looked at Plaintiff and announced that Dr. Sood was available that day but refused Plaintiff's request to add him to Dr. Sood's schedule. (*Id.* ¶¶ 35–36.) Finally, on November 14, 2014, when Plaintiff's infection had become so severe that other inmates carried him in a broken wheelchair to the medical unit, Defendant Grant confronted them and refused to let Plaintiff through. (*Id.* ¶¶ 49–52.) It was only after another inmate threatened Defendant Grant with violence that he agreed to let Plaintiff seek medical treatment. (*Id.*)

As to Defendant DiMatteo, Plaintiff clarified that on November 10, 2014, Defendant DiMatteo became aware that "Plaintiff's leg was swollen, locked at a 90-degree angle, and leaking infectious fluid all over his bed," but denied treatment because Plaintiff "refused to exercise his leg." (*Id.* ¶¶ 41–45.) Additionally, between October 20, 2014, and November 14, 2014, Defendant DiMatteo was "aware of Plaintiff's medical history as well as the fact that his left knee was seriously swollen and leaking infectious fluid," and that Plaintiff needed to see Defendant Shakir for a follow-up. (*Id.* ¶¶ 55–57.) During that period, Defendant Shakir visited Fort Dix on a number of occasions, but Defendant DiMatteo failed to notify Plaintiff of those visits. (*Id.*) Ultimately, on November 14, 2014, Plaintiff was rushed to St. Francis Hospital to see Defendant Shakir, because

3

"Plaintiff's knee was so infected that when the medical staff removed the bandages on his knee, infectious fluid came rushing out of his knee and formed a pool of liquid on the floor." (*Id*. ¶ 52.)

Nearly three years later, Plaintiff filed his initial complaint on November 6, 2017.[1] (ECF No. 1, at 9.) In his initial complaint, Plaintiff asserted Eighth Amendment deliberate indifference claims, alleging that the initial defendants refused to provide proper treatment, delayed necessary treatment, prevented him from receiving treatment, or some combination thereof. (*See generally*, ECF No. 1.) On December 3, 2018, the Court dismissed the majority of the initial complaint for failure to state a claim but allowed certain claims to proceed against former Defendants Hoey and Newbury, and Defendants DiMatteo, Grant, and Shakir. (ECF No. 3, at 26–27.)

On October 29, 2019, the Government filed a suggestion of death upon the record as to Defendant Hoey. (ECF No. 27.) Afterwards, Magistrate Judge Donio ruled that "Defendant Hoey was not a proper party to the case because he was deceased before the case was brought." (ECF No. 47, at 5 (internal quotation marks omitted).) As Defendant Hoey was never a proper party, Judge Donio held that Plaintiff could not substitute Defendant Hoey's estate, as Rule 25 "[s]ubstitution is not possible if one who was named as a party in fact died before the commencement of the action." (*Id*. (quoting *Coleman v. United States*, No. 15-1942, 2017 WL 2636045, at *5 (D.N.J. June 19, 2017).)

As to Defendant Newbury, on September 8, 2020, Judge Kugler granted Defendant Newbury's motion for summary judgment on statute of limitations grounds and for Plaintiff's failure to exhaust. (ECF Nos. 53, 54.) At the time, Defendant Newbury was the only properly

---

[1] Under the prison mailbox rule, the Court will accept the date on Plaintiff's Complaint as the filing date, (ECF No. 1, at 9), rather than the date that the Court actually received his Complaint. *E.g.*, *Hedgespeth v. Hendricks*, No. 06-3883, 2007 WL 2769627, at *3 (D.N.J. Sept. 21, 2007), *aff'd*, 340 F. App'x 767 (3d Cir. 2009).

4

served defendant. (ECF No. 53, at 2.)  Nearly two years later, in June of 2022, Judge Donio appointed counsel to represent Plaintiff in this matter. (ECF No. 81.)  Plaintiff filed a counseled Amended Complaint, (hereinafter "Complaint"), on October 17, 2022, which is the operative Complaint. (ECF No. 106.)

With regard to his administrative remedies, the parties agree that Plaintiff submitted a BP-9 and BP-10, and that the central office rejected his first BP-11, for failure to sign and failure to include a copy of the previous response. (ECF No. 114-2, at 21–24; ECF No. 118, at 23–24.)  The parties dispute, however, whether Plaintiff submitted a corrected BP-11.  Plaintiff alleges that he submitted a corrected BP-11, on June 1, 2015, by placing it in the prison mailbox. (ECF No. 118, at 23–24; ECF No. 118-1, at ¶ 12.)  The Federal Defendants contest that allegation and maintain that the Bureau of Prisons never received the corrected BP-11.[2]  (ECF No. 114-2, at 21–24; ECF No. 30-3 ¶ 7.)

The Federal Defendants now move for summary judgment under Rule 56. (ECF No. 114.)  Plaintiff filed an Opposition, (ECF No. 118), and the Federal Defendants filed a Reply (ECF No. 119).

## II.     STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton,* 572 U.S. 650, 656–57 (2014).  In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to

---

[2] As the Court intends to grant summary judgment on other grounds, the Court will assume that Plaintiff submitted his corrected BP-11 on June 1, 2015, and decline to rule on the issue of exhaustion. *See* 28 C.F.R. §§ 542.15(a) (stating that the central office has forty days to respond), 542.18 ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.").

the nonmoving party. *See Cotton,* 572 U.S. at 657. The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof," the moving party may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence that may show that genuine issues of material fact exist). The non-moving party must at least present probative evidence from which the jury might return a verdict in his favor. *Anderson*, 477 U.S. at 257. Where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 322. "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990).

### III. DISCUSSION

#### A. Statute of Limitations

The Federal Defendants argue that the Court should grant summary judgment because the statute of limitations bars Plaintiff's claims. (ECF No. 114-2, at 13–18.) Plaintiff raises claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Our jurisprudence takes the statute of limitations for a *Bivens* claim from the forum state's personal injury statute. *See Hughes v. Knieblher*, 341 F. App'x 749, 752 (3d Cir. 2009) (per

curiam). New Jersey's statute of limitations for personal injury actions is two years. *See* N.J. Stat. § 2A:14–2. "While state law provides the applicable statute of limitations, federal law controls when a *Bivens* claim accrues." *Peguero v. Meyer*, 520 F. App'x 58, 60 (3d Cir. 2013) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Under federal law, a *Bivens* claims accrues when a plaintiff knows of or has reason to know of the injury, "not upon awareness that this injury constitutes a legal wrong." *Hilton v. Kronenfeld*, No. 04-6420, 2008 WL 305276, at *7 (D.N.J. Jan. 29, 2008) (quoting *Oshiver v. Levin*, 38 F.3d 1380, 1386 (3d Cir. 1994)); *see also Hughes*, 341 F. App'x at 752; *Muhammad v. Erie Cnty. Convention Ctr. Auth.*, No. 20-162, 2021 WL 3603617, at *2 (W.D. Pa. Aug. 13, 2021).

Rather, "a cause of action accrues when the fact of injury and its connection to the defendant would be recognized by a reasonable person." *Kriss v. Fayette Cty.*, 827 F. Supp. 2d 477, 484 (W.D. Pa. 2011), *aff'd*, 504 F. App'x 182 (3d Cir. 2012); *see also*, *e.g.*, *Byrd v. Finley*, No. 19-6879, 2023 WL 1420445, at *6 (D.N.J. Jan. 31, 2023). The inquiry is an objective one and does not ask "what the plaintiff actually knew but what a reasonable person should have known." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Accordingly, "[a]s a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury." *Id.*

Here, Plaintiff complains of denials and delays in his medical care which may fall under the Eighth Amendment's prohibition against cruel and unusual punishment. For the delay or denial of medical care to rise to a constitutional violation, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety."

7

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). More specifically, courts have found deliberate indifference where a person: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse*, 182 F.3d at 197.

That said, courts give deference to prison medical authorities in the diagnosis and treatment of patients and will not "second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). As a result, allegations of medical malpractice or negligent treatment do not rise to constitutional violations. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013) (per curiam).

Applying those principles here, assuming *arguendo* that Plaintiff has otherwise valid *Bivens* claims, every event in the Complaint as to the Federal Defendants took place in October and November of 2014. (ECF No. 106, ¶¶ 24–57.) According to Plaintiff, on October 29, 2014, while Plaintiff was on his way to the medical unit for treatment, Defendant Grant threatened to "give [Plaintiff] a shot," if he walked towards the medical unit. (*Id.* ¶¶ 24–27.) It is unclear if that threat was successful. (*See id.*) Next, on November 6, 2014, while Plaintiff was waiting outside the medical unit for wheelchair assistance, Defendant Grant looked at Plaintiff, announced that Dr. Sood was available that day, and denied Plaintiff's request to see Dr. Sood. (*Id.* ¶¶ 35–36.) Finally, on November 14, 2014, when Plaintiff's infection had gotten so severe that other inmates carried him in a broken wheelchair to the medical unit, Defendant Grant refused to let Plaintiff through, until after an inmate threatened Defendant Grant with violence. (*Id.* ¶¶ 49–52.)

As to Defendant DiMatteo, Plaintiff alleges that on November 10, 2014, Defendant DiMatteo became aware that "Plaintiff's leg was swollen, locked at a 90-degree angle, and leaking infectious fluid all over his bed," but denied treatment because Plaintiff "refused to exercise his leg." (*Id.* ¶¶ 41–45.) Additionally, between October 20, 2014, and November 14, 2014, Defendant DiMatteo was "fully aware of Plaintiff's medical history as well as the fact that his left knee was seriously swollen and leaking infectious fluid," and that Plaintiff needed to see Defendant Shakir for a follow-up. (*Id.* ¶¶ 55–57.) Defendant Shakir visited Fort Dix on a number of occasions during that time period, but Defendant DiMatteo failed to notify Plaintiff of those visits. (*Id.*)

Throughout these events, Plaintiff alleged that he experienced substantial and noticeable pain and suffering. (*Id.* ¶¶ 24–57.) As a result, Plaintiff was aware that he suffered a harm when Defendants Grant and DiMatteo denied or delayed Plaintiff's attempts to seek medical treatment. (*Id.*) A reasonable person would have known that those denials and delays contributed to Plaintiff's pain and suffering, which culminated on November 14, 2014, when he was rushed to a hospital because his "knee was so infected that when the medical staff removed the bandages on his knee, infectious fluid came rushing out of his knee and formed a pool of liquid on the floor." (*Id.* ¶ 52.)

As a result, assuming Plaintiff had otherwise valid *Bivens* claims, he knew or should have known of his injuries, their connection to the Federal Defendants, and had complete causes of action, *at the latest*, by November 14, 2014. Ordinarily, outside the prisoner context, the statute of limitations would have begun to run on that date. However, because the Prison Litigation Reform Act prevents a prisoner from filing a § 1983 action until after he has exhausted his

9

administrative remedies, a prisoner's efforts to exhaust may[3] toll the limitations period. *See, e.g.*, *Wisniewski v. Fisher*, 857 F.3d 152, 157–58 (3d Cir. 2017); *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015); *McKinney v. Lanigan*, No. 18-8618, 2022 WL 10075302, at *3 (D.N.J. Oct. 17, 2022); *Hunter v. Chigozie*, No. 18-12543, 2020 WL 4013455, at *3 (D.N.J. July 16, 2020).

As mentioned above, the Court will assume for purposes of this motion that Plaintiff mailed a corrected BP-11 on June 1, 2015, and thus, fully exhausted his administrative remedies on July 11, 2015, when the central office's time to respond had passed. (ECF No. 118-1, at ¶ 12); *see generally* 28 C.F.R. §§ 542.15(a) (stating that the central office has forty days to respond), 542.18 ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level."). As a result, assuming *Pearson* and *Wisniewski* apply, the statute of limitations began to run on July 11, 2015, and expired on July 11, 2017. Accordingly, absent tolling, because Plaintiff did not file his initial complaint until November 6, 2017, the statute of limitations bars his claims against the Federal Defendants. Plaintiff agrees with these conclusions yet argues the Court should apply equitable tolling to save his claims. (*See* ECF No. 118, at 28–29.)

---

[3] In *Pearson*, the Third Circuit concluded that exhausting administrative remedies tolls the statute of limitations because of a Pennsylvania statute, which stated, "[w]here the commencement of a civil action or proceeding has been stayed . . . *by statutory prohibition*, the duration of the stay is not a part of the time within which the action or proceeding must be commenced." *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602–03 (3d Cir. 2015) (emphasis in original) (quoting 42 Pa. Cons. Stat. § 5535(b)). In *Wisniewski*, the Third Circuit appeared to hold more broadly that "because exhaustion of prison administrative remedies is mandatory under the Prison Litigation Reform Act . . . the statute of limitations . . . should be tolled while a prisoner pursues the mandated remedies." *Wisniewski v. Fisher*, 857 F.3d 152, 158 (3d Cir. 2017); *Hunter v. Chigozie, No. 18-12543*, 2020 WL 4013455, at *3 (D.N.J. July 16, 2020); *cf. Cordero v. FNU Ricknauer*, No. 13-2023, 2014 WL 4657104, at *7 (D.N.J. Sept. 17, 2014) (analyzing pre-*Wisniewski* Third Circuit and district court cases and concluding that tolling should apply while a prisoner exhausts).

### B. Equitable Tolling

Certain statutes and doctrines may allow the Court to toll the statute of limitations. For example, New Jersey statutes set forth certain bases for "statutory tolling." *See, e.g.*, N.J. Stat. § 2A:14–21 (detailing tolling because of minority or insanity); N.J. Stat. § 2A:14–22 (detailing tolling because of non-residency of persons liable). New Jersey law also permits "equitable tolling" where an adversary's misconduct induced or tricked a complainant into allowing the filing deadline to pass, or where "in some extraordinary way" someone or something prevented plaintiff from asserting his rights, or where a plaintiff has timely asserted his rights through a defective pleading or in the wrong forum. *See Freeman v. New Jersey*, 788 A.2d 867, 880 (N.J. Super. Ct. App. Div. 2002). However, absent a showing of a defendant's intentional inducement or trickery, a court should apply the doctrine of equitable tolling sparingly and only where sound legal principles and the interest of justice demand its application. *Id.*

When state tolling rules contradict federal law or policy, in certain limited circumstances, federal courts can turn to federal tolling doctrines. *See Lake v. Arnold*, 232 F.3d 360, 370 (3d Cir. 2000). Under federal law, equitable tolling is appropriate in three general scenarios: (1) where a defendant actively misleads a plaintiff with respect to his cause of action; (2) where extraordinary circumstances prevent a plaintiff from asserting his claims; or (3) where the plaintiff asserts his claims in a timely manner but has done so in the wrong forum. *Id.* at 370 n.9.

In the present case, Plaintiff argues that the Court should toll the statute of limitations: (1) because he misunderstood how the statute of limitations applied, and (2) because of the continuing violation doctrine. (ECF No. 118, at 27–31.) In his first argument, Plaintiff alleges that he mistakenly believed that "given his lingering issues with his knee resulting from the actions of all

11

Defendants, including the Federal Defendants and Defendant Shakir, up until 2016, that the statute of limitations period did not start until that time." (*Id*. at 29.)

While sympathetic to the Plaintiff's circumstances, the Court finds that Plaintiff's lack of knowledge, mistake, or misunderstanding as to the statute of limitations are not "extraordinary circumstances" sufficient to merit equitable tolling. *See, e.g.*, *Rowell v. Stecker*, 698 F. App'x 693, 696 (3d Cir. 2017) (finding that "[a]ttorney error, miscalculation, inadequate research or other mistakes do not constitute . . . extraordinary circumstances" in New Jersey); *Stokes v. Internal Affs. Section*, No. 19-20414, 2020 WL 1872979, at *2 (D.N.J. Apr. 15, 2020) (holding that "lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations"); *Velazquez v. Bd. of Trustees, Police & Firemen's Ret. Sys.*, No. A-2115-18T3, 2020 WL 3124685, at *5 (N.J. Super. Ct. App. Div. June 12, 2020) (same).  Nor are Plaintiff's *pro se* status and ignorance of the law a sufficient basis to relax the statute of limitations. *E.g.*, *Soumphonponphakdy v. Geico*, No. 19-16830, 2021 WL 616006, at *2 (D.N.J. Feb. 17, 2021), *aff'd sub nom. Soumphonphakdy v. Walilko*, No. 21-1459, 2021 WL 3629909 (3d Cir. Aug. 17, 2021); *Randolph v. Sherrer*, No. 08-69, 2008 WL 918500, at *5 (D.N.J. Apr. 1, 2008); *see also Zied v. Barnhart*, 418 F. App'x 109, 114 (3d Cir. 2011); *Huertas v. City of Philadelphia*, 188 F. App'x 136, 138 (3d Cir. 2006).

Next, Plaintiff argues that the Court should excuse his late filing under the continuing violation doctrine. "The continuing violation[] doctrine is an equitable exception to the statute of limitations." *Spencer v. Courtier*, 552 F. App'x 121, 123 (3d Cir. 2014).  It postpones the running of the statute of limitations "when a defendant's conduct is part of a continuing practice." *Randall v. City of Philadelphia Law Department*, 919 F.3d 196, 198 (2019) (quoting *Brenner v. Local 514, United Bhd. Of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)).  "If a

defendant's conduct constitutes a continuing practice, the entire claim may be timely if the last act of the practice falls within the statute of limitations." *Spencer*, 552 F. App'x at 123 (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)).

Critically, "the continuing-violation[s] doctrine focuses on continuing *acts*, not *effects*." *Randall*, 919 F.3d at 199 (emphases in original). "In other words, the doctrine relies on a *defendant's* continuing acts, not a *plaintiff's* continuing injury." *Id.* (emphasis in original). In sum, a plaintiff must demonstrate that a defendant committed at least one affirmative act within the statute of limitations, and that that act was part of a continuing practice to violate the plaintiff's rights. *Id.*; *see also Smith v. Dunn*, No. 20-2404, 2022 WL 1011214, at *2 (3d Cir. Apr. 5, 2022).

In order to establish that a defendant's conduct was part of a continuing practice, a plaintiff must demonstrate that "the defendant's conduct was more than isolated or sporadic acts." *Spencer*, 552 F. App'x at 123. To make this determination, courts consider two factors: "(1) whether the violations were related in subject matter and (2) whether the acts were recurring." *Bennett v. Susquehanna Cnty. Child. & Youth Servs.*, 592 F. App'x 81, 84 (3d Cir. 2014); *Smith v. Twp. of Warren*, No. 14-7178, 2016 WL 7409952, at *14 (D.N.J. Dec. 22, 2016). The Third Circuit has cautioned, however, that "the continuing violation[] doctrine is not a substitute for a plaintiff's awareness of and duty to assert his/her rights in a timely fashion." *Bennett*, 592 F. App'x at 85 (internal quotation marks omitted). Consequently, "the doctrine does not apply when plaintiffs are aware of the injury at the time it occurred." *Id.* (internal quotation marks omitted).

Applying those principles here, Plaintiff does not allege that the Federal Defendants took any affirmative actions or failed to take any action after November 14, 2014, that contributed to his injury. (ECF No. 106, ¶¶ 24–57.) As a result, Plaintiff has failed to allege that the Federal

13

Defendants undertook any affirmative acts or failed to take any action within the statute of limitations, *i.e.*, within two years of when he filed the initial complaint on November 6, 2017.

In his Opposition, Plaintiff argues that there are continuing *effects* of these Defendants' actions, (ECF No. 118, at 30–31), but the doctrine requires continuing *acts or failures to act* on the part of the Federal Defendants. *Randall*, 919 F.3d at 199. Without an affirmative act or failure to act within the limitations period, the continuing violation doctrine cannot apply. *Dunn*, 2022 WL 1011214, at *2 (finding that the continuing violation doctrine did not apply under similar circumstances). Additionally, as explained above, Plaintiff was well aware of his injuries, through the excruciating pain he suffered during his interactions with the Federal Defendants. As Plaintiff was aware of his injuries at or near "the time [they] occurred," the continuing violation doctrine does not apply for that reason as well. *Bennett*, 592 F. App'x at 85. Taken together, Plaintiff is not entitled to equitable tolling and his claims against the Federal Defendants remain time barred.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant the Federal Defendants' motion for summary judgment. The Court is appreciative of the efforts of appointed counsel for their zealous and continued representation in this matter. An appropriate Order follows.

Dated:  September 5, 2023

/s/ Christine P. O'Hearn
**Christine P. O'Hearn**
**United States District Judge**