**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NOE LEINHEISER,

        Plaintiff,

v.

T. HOEY, et al.,

        Defendants.

Civil Action No. 17-11642 (KMW) (AMD)

**OPINION**

**WILLIAMS**, District Judge:

This matter comes before the Court on Defendant Shakir's second motion for summary judgment. (ECF No. 200.) Plaintiff filed a response to the motion (ECF No. 206), to which Defendant replied. (ECF No. 215.) Also before the Court are the parties' motions to seal various parts of the record. (ECF Nos. 201; 213.) Given the privacy interests involved in Plaintiff's medical records, personal identifiers, and the like, this Court will grant both motions to seal.[1] For the following reasons Defendants motion for summary judgment shall be granted as to Plaintiff's federal claims, and the Court declines supplemental jurisdiction over Plaintiff's pendent state law medical negligence claim.

---

[1] The Court notes that Defendant partially opposed Plaintiff's motion to seal, essentially arguing that Plaintiff's motion went too far in restricting public access to medical records and the like, and could lead to the censoring of a potential trial. Given the outcome of Defendant's summary judgment motion, that concern is at best overstated. This Court finds that Plaintiff's medical records contain private information subject to protection, that the public has little interest in those records beyond the information already contained in the public filings in this matter, and that Plaintiff's motion to seal should therefore be granted.

I.   **BACKGROUND**

Plaintiff is a federal prisoner who, during his treatment by Defendant Shakir, was confined in FCI Fort Dix. (ECF No. 188 at 5.) Prior to his incarceration in federal prison beginning in 2003, Plaintiff injured his left knee while jumping off of his work vehicle. (ECF No. 206-5 at 6.) This resulted in a tear in his ACL, which was thereafter surgically reconstructed. (*Id.*) While in federal prison in 2006, however, Plaintiff reinjured his left knee while running. (*Id.*) Plaintiff received intermittent treatment for the pain by prison staff, but did not receive an MRI for his knee until after arriving at Fort Dix in 2013. (*Id.* at 7; ECF No. 188 at 4-5.) Following his MRI, Plaintiff was referred to see Defendant Shakir on March 4, 2014. (*See* ECF No. 214 at 2.) During that consultation, Shakir diagnosed Plaintiff with a medial meniscus tear and ACL tear. (*Id.*) According to the notes recorded by Shakir the same date, the two had a "detailed discussion" following this diagnosis, with Shakir informing Plaintiff that an "ACL reconstruction should be performed only as a last resort" and that knee injections should be pursued before considering surgery. (*Id.*) Should those injections fail to alleviate Plaintiff's symptoms, however, Shakir noted that an ACL reconstruction surgery may yet be required. (*Id.*) During his deposition, Dr. Shakir clarified that when he told Plaintiff that an ACL reconstruction was a last resort in an initial meeting, this note was a summary of an explanation in which he would have told Plaintiff that he would likely eventually need a total knee replacement, but that it was better to do all that could be done to delay such a surgery, and that the last action to be taken to delay a full reconstruction was an ACL reconstruction. (ECF No. 206-11 at 22.) In his interrogatory responses, Plaintiff confirmed that this discussion took place, that the doctor recommended against an ACL reconstruction as an initial course of treatment, and recommended the cortisone injections and eventual follow-up appointments. (ECF No. 212-1 at 3.) Plaintiff thereafter received several

2

cortisone injections into his knee. (ECF No. 206-5 at 9.) Plaintiff testified at his deposition that these injections alleviated Plaintiff's pain for "a good six months." (*Id.*)

Petitioner was seen again by Dr. Shakir on May 6, 2014. (ECF No. 212-2 at 4.) During that visit, Dr. Shakir determined that while the injections may have helped Plaintiff's pain, they "failed to relieve [Plaintiff's] symptomology" and would do nothing to resolve Plaintiff's ACL tear. (*Id.*) Based on his evaluation of Plaintiff, Dr. Shakir recommended an ACL reconstruction surgery as he felt a knee replacement was not warranted absent significantly greater degradation of the knee, and an ACL reconstruction would alleviate some instability, pain, and limitations on Plaintiff's movement. (*Id.*) According to Dr. Shakir, he "discussed with [Plaintiff] in detail" the "risks and benefits for operative intervention." (*Id.*)

Plaintiff testified at his deposition, however, that he did not specifically remember discussing the surgery or its risks or benefits with the Dr. in the spring or summer of 2014, though he did state that the steroid injections stopped helping him. (ECF No. 206-5 at 9-10.) Although Plaintiff did not recall whether the prison had gone through the process of approving an ACL surgery, he testified that he first learned of the surgery in October 2014 when he was called to medical and told he would be going in for the surgery the following day. (*Id.*) Plaintiff stated that, when taken to the hospital, he did sign a consent form expressing his consent to undergo the ACL surgery, but that he did not believe that he had discussed the risks of surgery with Dr. Shakir or otherwise discussed possible complications.[2] (*Id.* at 10.) The consent form he signed, however,

---

[2] In an unsigned declaration provided in opposition to summary judgment, Plaintiff contends that he doesn't recall ever signing this consent form, and suggests that it must have been signed *after* he had been anesthetized. (ECF No. 206-16 at 3.) Plaintiff also suggests that the document being marked as signed at 11:30 a.m., ninety minutes after he signed an anesthesia consent form confirms this. (*See* ECF No. 212-2 at 6.) Plaintiff at his deposition, however, stated that he did not actually fill out the date or time, and the record is therefore at best unclear as to when Plaintiff actually signed the form. Plaintiff also asserts in his unsigned declaration that he believes he was put under

3

states that Plaintiff had been informed of his condition, the risks and benefits of the surgery, the available alternatives and their risks and benefits, and had "discussed with [his] surgeon, in terms [he could] understand, [his] condition and treatment and all [his] questions ha[d] been answered to [his] full satisfaction" and that he therefore wished to undergo the ACL reconstruction surgery. (ECF No. 212-2 at 6.)

Dr. Shakir performed the ACL reconstruction surgery for Plaintiff on October 20, 2014. (ECF No. 212-2 at 8.) In his post-surgery report, Dr. Shakir stated that he had discussed in detail with Plaintiff the "risks and benefits of operative intervention" and that Plaintiff had made an informed consent in signing his consent form. (*Id.*) In the report, Dr. Shakir stated that the surgery was at least initially successful in repairing Plaintiff's tear, and that Plaintiff was in stable condition following the procedure. (*Id.* at 8-10.) The doctor reported no complications. (*Id.* at 8.) Plaintiff was thereafter discharged from the hospital. (ECF No. 214-4 at 2.) In his discharge instructions, Dr. Shakir noted that Plaintiff should receive a follow-up appointment in two weeks. (*Id.*) Although Plaintiff was apparently told on October 30, 2014, that he was scheduled to see Shakir "soon" after that point for his follow-up, no follow-up occurred, possibly due to Plaintiff's subsequent development of an infection. (*See* ECF No. 206-5 at 23.)

Following his discharge from the hospital, Plaintiff was returned to the prison with his knee wrapped and braced. (*Id.* at 10.) According to Plaintiff, Nursing staff told Plaintiff to slowly "wean" himself off the knee brace by periodically removing it and engaging in normal motion. (*Id.* at 11.) Plaintiff was also told to change his dressing daily. (*Id.* at 12-13.) After his return to prison, Plaintiff went to the medical department and requested a cane, which he was ultimately

---

by 11:00, but it remains questionable whether Petitioner could have signed the form, which he admits he did, after being "put under." (*See* ECF No. 2016-16 at 3.)

4


provided. (*Id.* at 11.) Plaintiff had the dressing changed each of the next two days and was told the wound "looked good" by nursing staff. (*Id.* at 12-13.)

Plaintiff returned to medical a week later on October 29 after his leg "popped" and sometime later discovered a "welt" on his wound. (*Id.* at 13.) Prison staff x-rayed Plaintiff's leg, but told him there was nothing to be done and that Plaintiff should not have removed his leg brace. (*Id.*) Plaintiff placed the brace back on his knee, but the compression caused him pain. (*Id.* at 14.) The following day, Plaintiff told corrections officers he couldn't bend his knee or walk. (*Id.*) The problems apparently worsened, and Plaintiff returned to the medical unit on November 6, 2014. (*Id.* at 15.) He was told by nurses to attempt to stretch his knee and rehabilitate it. (*Id.*) Later that day, Plaintiff passed out from the pain in his leg in the shower and fell. (*Id.*) Plaintiff borrowed a wheelchair and was taken to medical after others discovered him on the floor. (*Id.*) Plaintiff was again instructed by nursing staff to exercise and stretch his leg. (*Id.* at 16.)

Plaintiff returned to medical again on November 14, with his leg leaking fluids, and was ultimately transferred to the emergency room. (*Id.*) That day, Plaintiff was taken into surgery by Dr. Shakir to treat the infection that had developed in his knee following the ACL repair surgery. (*Id.* at 17.) During surgery, the doctor drained the abscess that had formed on the wound in light of the infection, cleaned the wound with sterile fluids, debrided the joint, and ultimately closed and rewrapped Plaintiff's leg. (ECF No. 177-5 at 2-3.) The doctor noted that, despite the infection, Plaintiff's ACL was intact. (*Id.*)

Plaintiff remained in the hospital following this surgery, recovering from his infection until December 13, 2014. (*See* ECF No. 214-3 at 2.) During this time, Dr. Shakir did visit briefly with Petitioner at least twice. (ECF No. 206-5 at 17.) Plaintiff testified that Shakir told him after surgery that he needed to stop using a knee brace and work on getting back on his feet, and that in a subsequent visit Shakir told Plaintiff that his suture would be removed. (*Id.*) Dr. Shakir also

recommended that Plaintiff take advantage of as much physical therapy as he could get to rehabilitate his knee. (*Id.*)

Plaintiff returned to the prison on December 13, 2024, and was seen by medical staff, who reported that Plaintiff had minor discomfort but no other complaints. (ECF No. 214-3 at 2.) Plaintiff, however, also testified that he had extremely limited mobility in his knee at this time. (ECF No. 206-5 at 18.) On January 28, 2015, Dr. Newland of Fort Dix requested that Dr. Shakir provide a follow-up consultation for Plaintiff's knee. (ECF No. 212-2 at 12.) Dr. Shakir thereafter saw Plaintiff again on February 12, 2015. (*Id.* at 11.) Upon examination, Dr. Shakir found no sign of infection, but that Plaintiff had a very limited range of motion in his knee. (*Id.*) Dr. Shakir noted that the status of Plaintiff's ACL would need to be reassessed via an MRI, and that Plaintiff should both continue to follow up for further care and that Plaintiff should "concentrate on performing range of motion [exercises] to regain as much motion as possible." (*Id.*)

Plaintiff underwent an MRI and Dr. Sood of Fort Dix requested another follow-up consultation with Dr. Shakir on April 1, 2015. (*Id.* at 15.) Plaintiff had his follow-up consultation with Dr. Shakir on April 7, 2015. (*Id.* at 14.) After reviewing the MRI, Dr. Shakir concluded Plaintiff was showing very slow improvement. (*Id.*) Dr. Shakir therefore recommended Plaintiff continue working on strengthening his knee and improving his range of motion, that Plaintiff "wean himself off [using a] wheelchair and . . . crutches" and that Plaintiff's symptoms could resolve within six months if Plaintiff did so. (*Id.*) The doctor further noted that Plaintiff would need to have a bone scan to check for signs of continued infection in or after November 2015, and that Plaintiff would likely need a full knee replacement once he was found to be clear of infection after at least a year given the advanced state of his arthritis after the infection. (*Id.*) Dr. Shakir also recommended further follow up appointments, as well as the provision of a knee brace. (*Id.* at 14-15.) Dr. Sood requested a further follow-up consultation on April 17, 2015. (*Id.* at 17.) Dr.

6

Shakir performed this follow-up with Plaintiff on April 21, 2015. (*Id.* at 16.) Dr. Shakir noted no changes, again noted the need for a bone scan after a year had passed, and suggested that cortisone injections may be warranted if Plaintiff's pain persists. (*Id.*)

Thereafter, Dr. Sood requested another follow-up with Dr. Shakir in July 2016. (ECF No. 212-2 at 19.) Dr. Shakir next saw Plaintiff on July 12, 2016. (*Id.* at 18.) Following this consultation, Dr. Shakir noted that Plaintiff had "advanced degenerative changes" to his knee and would require further surgeries to resolve the issue. (*Id.*) The doctor noted that there was no sign of infection, recommended a bone scan to confirm a lack of infection, and recommended that Plaintiff be provided a hinged knee brace. (*Id.*) Dr. Shakir also noted that a total knee replacement would be warranted with a completely negative bone scan. (*Id.*)

Plaintiff testified that, following his April 2015 appointment, Dr. Sood told Plaintiff that the recommended knee brace was "ineligible" for use in Fort Dix, and would need to clarify the device in question with Dr. Shakir. (ECF No. 206-5 at 24.) In his July 2016 consultation, Dr. Shakir clarified that a hinged knee brace was needed for Plaintiff. (ECF No. 212-2 at 18.) BOP records for Petitioner indicate that he was issued a hinged knee brace ten days later on July 22, 2016. (ECF No. 214-7 at 2.)

Plaintiff received a bone scan in September 2016, which did not completely exclude the possibility of "osteomyelitis." (ECF No. 212-2 at 21.) Therefore, Dr. Sood recommended a further bone scan or MRI, and requested another follow-up consultation with Dr. Shakir. (*Id.*) Dr. Shakir saw Plaintiff for the final time on October 18, 2016. (*Id.* at 20.) At that time, Dr. Shakir noted that Plaintiff needed a total knee replacement, but neither Plaintiff nor the BOP was willing to have that surgery performed while he was housed at Fort Dix as Fort Dix does not have sufficient rehabilitative resources to provide required physical therapy following such an intervention. (*Id.*) According to Plaintiff, he did eventually have a completely negative bone scan, and is currently in

7

the process of attempting to be transferred to a medical BOP facility for the surgery, but the BOP initially denied this request in September 2016 because of Plaintiff's BMI. (ECF No. 206-5 at 19.) Plaintiff has apparently continued to seek the surgery, but suggested that the BOP is delaying for bureaucratic reasons. (*Id.*)

During his deposition, Dr. Shakir testified that, during the relevant time frame, he had a contract with NaphCare, Inc., through which he provided orthopedic services to prisoners at Fort Dix. (ECF No. 206-11 at 7-8.) Under this arrangement, Dr. Shakir went to the prison for a clinic approximately every two weeks on Tuesdays, and he would see the inmates brought to the clinic by BOP staff. (*Id.*) The doctor testified that Fort Dix staff handled the scheduling of patients for the clinic, and he had no part in choosing which prisoners he would see or in scheduling particular prisoners for appointments or follow-up care. (*Id.*) Dr. Shakir would receive the schedule of prisoners he was to see only upon his arrival at the prison, and was not provided advance notice of which patients would be seen. (*Id.* at 8.) Dr. Shakir testified that he and his office "had no interaction with any tools or power to schedule or not to schedule any patients," and that all scheduling was handled by staff at Fort Dix itself. (*Id.*) Dr. Shakir did not recall when or how many times he was present in the prison between Plaintiff's surgery on October 20 and his subsequent emergency surgery on November 14, though a total of four Tuesdays occurred during this time period: October 21 and 28, and November 4 and 11. (*Id.*) Dr. Shakir testified that, due to administrative issues, clinics would sometimes be cancelled because he could not get through McGuire Air Force Base and Fort Dix security before the time for clinics ended, so it is unclear how often he was in the prison during those four Tuesdays. (*Id.* at 9.) Dr. Shakir also testified that some inmates scheduled to see him would not arrive due to internal prison issues, and he had no control over that or ability to force a visit if the prison did not produce a particular patient. (*Id.*) Dr. Shakir testified that his relationship with NaphCare and Fort Dix eventually broke down

8

sometime in 2016 or 2017 after the prison repeatedly delayed surgeries, ended elective surgeries, and frustrated his efforts to treat patient injuries. (*Id.* at 10.) Dr. Shakir testified that these issues first arose prior to his treating of Plaintiff. (*Id.*)

Dr. Shakir also testified at his deposition that he did not have any control over what knee braces were provided to inmates, as the BOP disfavored braces using metal. (*Id.* at 18.) He could therefore only recommend that a brace be provided, and could not delineate specific models to be used. (*Id.*) As to Plaintiff's issue with the delay in being provided a brace, Dr. Shakir testified that he usually does not recommend use of them as they have "no relevance to arthritis" and will not treat arthritis. (*Id.*) Dr. Shakir testified that he recommended a brace for Plaintiff because Plaintiff desired one and the doctor had no specific objection, though he did not believe the brace would significantly affect Plaintiff's condition. (*Id.* at 18-19.)

In support of his claims, Plaintiff has provided in this matter an expert report drafted by Dr. Merrick Wetzler. (*See* ECF No. 200-9 at 2-3.) In his report, Dr. Wetzler summarized the history of Plaintiff's case, and opined that the ACL reconstruction Plaintiff underwent is not well indicated "when the patient is more or less sedentary." (*Id.* at 3.) Such a surgery, the doctor noted, would be well advised for an active 51-year-old engaged in sporting activities, but the value of such a surgery decreases the more sedentary and the more arthritic the individual in question is. (*Id.*) Once arthritis arises, Dr. Wetzler opines, the patient will eventually require a total knee replacement, and the choice to first conduct an ACL reconstructions for someone with Plaintiff's history and low activity level, even absent infection, "can make their arthritis progressively worse." (*Id.*) The doctor, relying on Plaintiff's assertion that he was not given a full explanation of the risks and benefits of surgery, therefore opines that not giving Plaintiff a proper choice "does go below the standard of care" for providing for informed consent. (*Id.*) Dr. Wetzler does not opine as to whether Dr. Shakir's actions amount to deliberate indifference to Plaintiff's needs, and

9

instead at most suggests that Dr. Shakir's treatment decisions could amount to medical negligence or malpractice. (*Id.*) Dr. Wetzler does not opine on the knee brace issue, nor does he opine on Plaintiff's allegations as to delayed follow-up care. (*Id.*) During his deposition, Dr. Wetzler agreed that he had not opined on or discussed deliberate indifference in his review of Plaintiff's case. (ECF No. 200-10.)

The record also contains a report prepared for Defendant by Dr. Stephen Zabinski. (*See* ECF No. 176-14.) Following a review of the record, and after noting that Dr. Wetzler had not addressed the brace or follow up scheduling issues, Dr. Zabinski opined that the care provided by Defendant "was appropriate and within accepted standards of orthopedic care" as Dr. Shakir had first sought non-operative treatments, and resorted to surgery only when those treatments failed to produce results. (*Id.* at 7.) Dr. Zabinski also opined that any delay in follow-up scheduling or brace provision was not the result of negligence or indifference on Dr. Shakir's part, but instead resulted from the choices and actions of Fort Dix staff who were in control of Plaintiff. (*Id.* at 7-8.) Dr. Zabinski agreed with Defendant that the provision of a brace has "no material impact whatsoever on the patient's knee condition" and "no manner of bracing whether it would be hinged, soft or unloader would have made any material difference regarding the outcome and prognosis of [Plaintiff's] knee." (*Id.*) Dr. Zabinski also disagreed with Dr. Wetzler's conclusion, finding that Dr. Shakir's course of treatment did not deviate from the appropriate standard of care and indicated that Defendant had discussed with Plaintiff the risks and benefits of surgery and permitted Plaintiff an informed choice. (*Id.*)

## II.  LEGAL STANDARD

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."

*Serodio*, 27 F. Supp. 3d at 550.

11

## III.  DISCUSSION

Defendant argues in his motion that he is entitled to summary judgment as to Plaintiff's deliberate indifference to medical needs claims, which arise under the Eighth Amendment as Plaintiff was a convicted federal prisoner during his course of treatment. To establish liability for such a claim, a plaintiff must show that the defendant was deliberately indifferent to his medical needs. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). This requires both that the plaintiff show that he had a sufficiently serious medical need, and that the defendant engaged in actions or omissions which indicate that he knew of and disregarded "an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A medical need is sufficiently serious where it "has been diagnosed as requiring treatment or [is a need that] is so obvious that a lay person would easily recognize the necessity of a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert denied*, 486 U.S. 1006 (1988). "'Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). In such cases, a plaintiff may generally not show deliberate indifference by merely expressing his disagreement or dissatisfaction with the defendant's course of action. *See Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Likewise, because a claim under the Eighth Amendment requires that a defendant be deliberately indifferent, a species of recklessness, a claim asserting medical negligence alone is insufficient to support a claim for relief. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

12

In his operative amended complaint, Plaintiff asserts that Defendant was deliberately indifferent to Plaintiff's medical needs by not conducting a follow-up visit with Plaintiff two weeks after his initial ACL surgery while Plaintiff was housed at Fort Dix, and in failing to specify or clarify the appropriate knee brace for Plaintiff, delaying Plaintiff's receipt of the brace until the summer of 2016. Turning first to the issue of the follow-up appointment, the record makes it clear that Dr. Shakir saw Plaintiff frequently, treated his issue at first conservatively and then through surgery, treated Plaintiff's infection with further surgical intervention when Plaintiff was taken to the hospital, and continued to see Plaintiff as requested by medical staff at Fort Dix over the course of several years and that Shakir therefore did provide Plaintiff with treatment for several years for his ongoing knee problems. This is not a case in which Plaintiff received no treatment, and indeed is a case in which Defendant provided a considerable and lengthy course of treatment, whatever its ultimate results.

More to the point, following his initial ACL surgery, Dr. Shakir's discharge instructions did suggest a follow-up appointment after two weeks. Dr. Shakir's testimony, which is controverted only by Plaintiff's assertions not based on documentary or competent testimonial evidence, was that he did not control the scheduling of appointments or follow-ups for Fort Dix prisoners, and that prison medical staff instead determined who he would see while at the prison every two weeks. The documentary evidence in the record supports this testimony – Plaintiff's visits with Dr. Shakir appear to have been routinely preceded by a request for a consultation from prison medical staff, who provided Shakir with a sheet for each occasion detailing Plaintiff's current status and progression for his review. The competent evidence in the record thus indicates that Dr. Shakir did not have any control over whether or not he saw Plaintiff for a two-week follow up after his surgery, he suggested that one occur, and it did not prior to Plaintiff's return to the hospital with an infection.

13

Dr. Shakir's testimony was that he came to the prison every two weeks on Tuesdays. Dr. Shakir would thus have been at the prison on two of the following four Tuesdays between Plaintiff's two surgeries: October 21 and 28 and November 4 and 11. Dr. Shakir did not recall which of these days he was at the prison, but it is clear that Plaintiff's follow-up could not have occurred on October 21 or 28, both of which were less than two weeks from Plaintiff's surgery. Indeed, Plaintiff's actual follow-up surgery occurred on November 14, just over three weeks after Plaintiff's initial surgery and just over a week after the point at which Dr. Shakir recommended to prison staff that Plaintiff receive a follow-up visit. Even had prison staff scheduled Plaintiff for a follow-up in a more timely fashion, it would have occurred either ten or three days before he was ultimately taken in for emergency surgery. Plaintiff has provided no testimony, expert or otherwise, to suggest that a delay of three to ten days[3] severely impacted his developing an infection or recovery issues following his initial surgery, and Plaintiff's own testimony suggests that his problems had begun as soon as October 29, and that his surgery wound was already showing signs of infection – largely untreated by prison staff rather than Defendant – in the first week of November.

In any event, because the competent evidence in the record indicates that prison staff, and not Dr. Shakir, determined when Plaintiff would be seen by Defendant, and Defendant was not brought in for a follow-up by prison staff, Dr. Shakir could not have been deliberately indifferent to Plaintiff's needs in failing to schedule a follow-up over which he had no control. As Plaintiff thus cannot show that Defendant was deliberately indifferent to his needs in "failing" to perform a more timely follow-up evaluation after Plaintiff's surgery, Plaintiff cannot show that Defendant

---

[3] Based on the fact that Shakir was present for his clinic at Fort Dix on April 7, 2015, one would expect that he would have been at the prison on November 11, 2014, given his alternating Tuesday schedule.

14

was deliberately indifferent to his needs for the three to ten day delay in his being given further treatment, and Defendant is entitled to summary judgment as to this portion of Plaintiff's Eighth Amendment deliberate indifference claim.

In the remaining portion of his claim, Plaintiff asserts that Dr. Shakir was deliberately indifferent in failing to clarify what sort of brace Plaintiff was to be given, ultimately resulting in Plaintiff not receiving a brace until shortly after Dr. Shakir clarified that Plaintiff needed a hinged brace in the summer of 2016. The record before the Court contains only two medical opinions on the necessity or benefits of the use of a hinged knee brace for a person in Plaintiff's situation, those of Dr. Shakir himself and those provided by Dr. Zabinski, both of whom opined that the use or disuse of a hinged knee brace for a person in Plaintiff's situation would make no material difference to his recovery or progression. Thus, the record does not include clear testimony suggesting that the provision or use of a brace was medical necessary or even medically beneficial, which itself severely undermines Plaintiff's claims.

More importantly, however, the record again indicates this is an issue that arose chiefly because of issues with the prison itself rather than because of any delay or fault on the part of Dr. Shakir. Dr. Shakir's notes indicate that he placed the provision of a brace in Plaintiff's treatment plan when Plaintiff asked for one, and Plaintiff's own testimony states that it was prison doctors, and not Defendant, who told him that the brace in question was "ineligible" and that the prison doctors would need to clarify the sort of brace to provide Plaintiff. Dr. Shakir's testimony, again controverted by Plaintiff's assertions rather than clear competent evidence, was that he had no control over what brace could be provided, and that prison medical staff would make that determination based on internal rules and restrictions. The record also indicates that Dr. Shakir did clarify what sort of brace should be provided – a hinged brace – once the issue was raised to

15

his attention in July 2016, the first time Shakir had seen Plaintiff since Plaintiff's two appointments in April 2015 when he had first instructed staff to provide Plaintiff the requested brace.

These facts are not indicative of deliberate indifference. Indeed, the record viewed in full suggests that the brace in question was likely of little if any medical benefit to Plaintiff's recovery, the doctor directed that a brace be provided when Plaintiff requested one, the doctor clarified the type of brace when the issue was brought to his attention, and Plaintiff was thereafter provided the type of brace recommended through that clarification shortly thereafter. Given the doctor's testimony that prison staff, rather than Defendant, determined what sort of brace to provide, and Defendants actions in attempting to accommodate Plaintiff's request for the brace, Plaintiff has failed to provide evidence to support the inference that Defendant was deliberately indifferent to his medical needs in relation to the brace. Defendant is therefore entitled to summary judgment on that claim as well.

In his final remaining claim, Plaintiff contends that Dr. Shakir failed to provide him with enough information to provide informed consent to undergo ACL reconstruction surgery. That claim, however, is a state law medical negligence claim over which this Court does not have original jurisdiction. Pursuant to 28 U.S.C. § 1367(c)(3), where a district court dismisses all claims over which it has original jurisdiction, the court "may decline to exercise supplemental jurisdiction" over any pendent state law claims. The Third Circuit has long held that where all federal claims are "dismissed before trial, the district court *must* decline to decide the pendent state claims" absent sufficient affirmative justification for doing otherwise. *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000). As this Court perceives no affirmative justification for exercising supplemental jurisdiction in this matter, and as this Court has now entered summary judgment as to all of Plaintiff's federal claims, this Court declines supplemental jurisdiction over Plaintiff's medical negligence claims and therefore dismisses them without prejudice at this time. To the

extent Plaintiff wishes to pursue that claim, he may do so by filing an appropriate complaint in state court within thirty days. Pursuant to 28 U.S.C. § 1367(d), the limitation period for Plaintiff's medical negligence claim is deemed tolled for the time it was pending in this Court and for thirty days after the dismissal of this matter.

## IV.     CONCLUSION

In conclusion, Defendants' second motion for summary judgment (ECF No. 200) is granted as to Plaintiff's federal claims. Judgment is entered in favor of Defendant as to Plaintiff's federal deliberate indifference to medical needs claims. Plaintiff's state law medical negligence claims are dismissed without prejudice to their being reraised in state court within thirty days. An appropriate order follows.

Hon. Karen M. Williams,
United States District Judge